**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**PECOS DIVISION**

| | | |
|---|---|---|
| **JUSTIN DEWAYNE WENCKENS,** | § | |
| **TDCJ NO. 02477197,** | § | |
| ***Plaintiff*,** | § | |
| | § | |
| **v.** | § | **P-25-CV-00005-DC** |
| | § | |
| **MANUEL ENRIQUEZ, JR., *et al.*,** | § | |
| ***Defendants*.** | § | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**Table of Contents**

Table of Contents ........ i

Table of Authorities ........ iii

I. Introduction ........ 1

II. Claims Presently Before The Court. ........ 3

III. Summary Judgment Standard ........ 3

IV. Genuine Disputes of Material Fact Preclude Summary Judgment. ........ 4

- A. Defendants' Account of How the Confrontation Began Is Materially Disputed. ........ 4
- B. The J1 B Wing Video Submitted by Defendants Omits the Beginning of the Encounter. ........ 5
- C. The Objective Start and Stop Times Undermine Defendants' Claim That Their Narrative Is Undisputed. ........ 7
- D. Whether Plaintiff Threw "Hot Coffee" Into Enriquez's Face Is Genuinely Disputed. ........ 8
- E. Defendants' Own Use-of-Force Evidence Contains Material Evidence Favorable to Plaintiff. ........ 9
- F. Defendants' Own Report Acknowledges That Perez and Ortega Used Force. ........ 10
- G. Genuine Issues of Material Fact Exist as to Flores's Personal Use of Force. ........ 10
- H. The Extent of Plaintiff's Injuries Does Not Eliminate His Excessive-Force Claim. ........ 11
- I. Genuine Fact Issues Exist Under the Hudson Factors. ........ 12

V. Genuine Fact Issues Preclude Summary Judgment On Bystander Liability ........ 13

VI. Qualified Immunity Does Not Support Summary Judgment ........ 14

Conclusion ........ 15

Certificate of Service ........................................................................................................17

Declaration of Justin Dewayne Wenckens .......................................................................18

## Table of Authorities

**<u>Cases</u>**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .......... 3

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .......... 3

*Hudson v. McMillian*,
503 U.S. 1 (1992) .......... 11, 12

*Joseph v. Bartlett*,
981 F.3d 319 (5th Cir. 2020) .......... 13

*Kitchen v. Dallas Cnty.*,
759 F.3d 468 (5th Cir. 2014) .......... 14

*Scott v. Harris*,
550 U.S. 372 (2007) .......... 3

*Whitley v. Hanna*,
726 F.3d 631 (5th Cir. 2013) .......... 13

**<u>Rules</u>**

Fed. R. Civ. P. 56(a) .......... 3

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiff Justin Dewayne Wenckens, proceeding pro se, files this Response in Opposition to Defendants Enriquez, Perez, Ortega, and Flores's Motion for Summary Judgment (Doc. 76), and respectfully shows:

## I. Introduction

Defendants' Motion for Summary Judgment depends upon the Court accepting Defendants' version of sharply disputed events and drawing factual inferences from incomplete surveillance recordings in Defendants' favor. Rule 56 requires the opposite.

The parties dispute how the confrontation began; who initiated the physical encounter; whether Plaintiff threw hot coffee into Defendant Enriquez's face; whether the amount and duration of force were justified; whether force continued after Plaintiff no longer presented a threat; which officers witnessed the force; and whether those officers had a reasonable opportunity to intervene.

The video evidence does not eliminate those disputes.

Most importantly, the portion of the J1 B Wing surveillance recording submitted by Defendants does not include the initial verbal encounter that precipitated the entire incident, even though Plaintiff maintains that the encounter occurred within the area covered by that camera. According to Plaintiff's review, the three surveillance recordings submitted as Exhibits E, F, and G begin at approximately 3:45:20 a.m. and end at approximately 3:58:21 a.m. *See* Wenckens Decl. ¶¶ 13–14.

The produced J1 B Wing footage begins only after the initial verbal exchange described by Plaintiff. Indeed, Plaintiff observes that the beginning of the produced surveillance footage depicts another correctional officer leaving the B-Wing area and communicating with Enriquez in the

picket. Plaintiff maintains that this officer had overheard Plaintiff's earlier remark and reported it to Enriquez. *See* Wenckens Decl. ¶¶ 7, 10.

That sequence is material because Defendants characterize the subsequent encounter as Plaintiff aggressively approaching Enriquez outside the J1 Building. Defendants' Motion states that Plaintiff "aggressively approached Enriquez" at approximately 4:00 a.m. Plaintiff's account is materially different.

According to Plaintiff, Enriquez was inside the enclosed picket and did not personally hear Plaintiff's earlier remark. Another officer overheard Plaintiff's comment, went to the picket, communicated the remark to Enriquez, and Enriquez thereafter left the picket before the physical confrontation occurred. The portion of the J1 B Wing surveillance footage submitted by Defendants begins after the initial verbal encounter and therefore does not permit the Court to independently evaluate the parties' competing accounts of that critical beginning. *See* Wenckens Decl. ¶¶ 4–12.

Nor do the remaining recordings provide a continuous depiction of the incident. Plaintiff's review indicates that the three surveillance recordings end at approximately 3:58 a.m., while the separate handheld use-of-force/aftermath recording lasts approximately five minutes and forty-eight seconds and ends at approximately 4:04 a.m. *See* Wenckens Decl. ¶¶ 15–17.

Defendants cannot use what an incomplete recording fails to depict as affirmative evidence that Plaintiff's sworn account did not occur.

Moreover, Defendants' own documentary evidence contains material inconsistencies, incomplete documentation, internal concerns regarding the use of force, and evidence from which a reasonable jury could reject Defendants' characterization of the incident.

Viewed in the light most favorable to Plaintiff, genuine disputes of material fact remain. Summary judgment should be denied.

## II. Claims Presently Before The Court.

The surviving claims are narrowly defined.

Defendants acknowledge that the claims remaining are Plaintiff's individual-capacity Eighth Amendment excessive-force claims against Enriquez and Flores and Plaintiff's individual-capacity Eighth Amendment bystander-liability claims against Perez, Ortega, and then-unidentified John Doe No. 1.

The Court previously adopted the Magistrate Judge's recommendation and expressly denied Defendants' motions to dismiss Plaintiff's excessive-force and bystander-liability claims.

Accordingly, the question at this stage is whether Defendants have demonstrated the absence of any genuine dispute of material fact concerning those surviving claims. They have not.

## III. Summary Judgment Standard

Summary judgment is appropriate only where the movant demonstrates that no genuine dispute exists as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

At summary judgment, the evidence must be viewed in the light most favorable to the nonmovant, and reasonable factual inferences must be drawn in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Defendants themselves recognize that a nonmovant's account may be disregarded in favor of video evidence only where the account is blatantly contradicted or utterly discredited by the recording. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

That principle does not permit a court to reject sworn testimony concerning events that the submitted video does not show. Nor does it permit the Court to choose between competing reasonable interpretations of incomplete recordings.

## IV. Genuine Disputes of Material Fact Preclude Summary Judgment.

### A. Defendants' Account of How the Confrontation Began Is Materially Disputed.

Defendants' excessive-force analysis depends substantially upon their characterization of Plaintiff as aggressively confronting Officer Enriquez outside the building while shouting verbal threats and clenching his fists. The record, when viewed in Plaintiff's favor, permits a materially different account of how the confrontation developed.

As stated in Plaintiff's Original Complaint (¶¶ 39–42) and further explained in his Declaration, the initial interaction regarding the cell lights occurred entirely while Officer Enriquez was safely locked inside the secure control picket. Plaintiff was standing on the dayroom floor outside the picket window, completely separated from the officer by thick security glass. *See* Wenckens Decl. ¶¶ 4–6.

Because of this physical barrier, the parties could not actually hear each other; they were merely mouthing words and using hand gestures through the glass. Plaintiff knocked on the window, gestured to the cell lights, and mouthed, *"What's up with the lights?"*. Enriquez mouthed back an obscenity. As Plaintiff walked away toward the dayroom tables, he remarked aloud to himself, *"... You kiss your mom with that mouth?"*.

The J1 B Wing security video (DEF_0741) only shows Plaintiff sitting at a table in the middle of the dayroom. Because Enriquez remained physically separated from Plaintiff by the secure picket glass during this exchange, a reasonable factfinder could conclude that Plaintiff did not pose an immediate physical threat to Enriquez at that time.

Rather than maintaining his secure post, the physical evidence demonstrates that Officer Enriquez affirmatively left his safe post inside the picket to pursue Plaintiff outside. Rather than remaining inside the secure picket, Enriquez left the picket and subsequently encountered Plaintiff outside on the walkway. Plaintiff maintains after he was about 10 to 15 yards from exiting the J1 B Wing building, that Enriquez instructed him to stop walking and walk back to him, where the physical confrontation occurred. *See* Wenckens Decl. ¶¶ 6, 10–12.

Significantly, the portion of the surveillance footage Defendants submitted begins only after this initial exchange. Near the beginning of the produced footage, Plaintiff observes the other correctional officer go to the picket and communicate with Enriquez. Enriquez thereafter exits the picket. *See* Wenckens Decl. ¶¶ 4–12.

Thus, a reasonable factfinder could conclude that Enriquez learned of Plaintiff's remark from the other officer, subsequently left the secure picket, and encountered Plaintiff outside. That chronology differs materially from Defendants' characterization of the incident as beginning when Plaintiff simply "aggressively approached" Enriquez.

The distinction is material to the *Hudson* analysis because it bears upon the circumstances preceding the use of force, the threat reasonably perceived by Enriquez, the need for force, and whether the force ultimately employed constituted a good-faith effort to restore discipline.

**B. The J1 B Wing Video Submitted by Defendants Omits the Beginning of the Encounter.**

Plaintiff has consistently maintained that the confrontation did not begin outside J1 with Plaintiff suddenly approaching Enriquez.

Plaintiff's Original Complaint states that the incident began with a verbal dispute involving Enriquez and that the physical confrontation occurred thereafter. Compl. ¶¶ 40–42. The Magistrate

Judge likewise summarized Plaintiff's allegations as involving a verbal dispute with Enriquez before Enriquez left his post and the physical encounter occurred.

The J1 B Wing surveillance recording is therefore particularly important.

Plaintiff maintains that the initial verbal encounter occurred when J1 B Wing was being released for chow and within the area covered by the J1 B Wing camera. Nevertheless, the portion of the J1 B Wing footage submitted as Exhibit E begins at approximately 3:45:20 a.m., after that exchange.

The beginning of the produced footage itself is significant. Plaintiff observes another officer leaving the B-Wing area and communicating with Enriquez in the picket. According to Plaintiff, that officer had overheard Plaintiff make a remark concerning Enriquez's mother and went to tell Enriquez what Plaintiff had said. *See* Wenckens Decl. ¶¶ 7, 10.

Plaintiff further states, based upon his personal familiarity with the physical configuration of the J1 picket, that Enriquez could not have heard Plaintiff's remark through the enclosed picket glass. *See* Wenckens Decl. ¶ 6. Thus, Plaintiff's account is that Enriquez learned of the comment from the other officer rather than hearing it himself.

The resulting chronology permits a reasonable inference materially different from Defendants' account: another officer hears Plaintiff's comment; that officer communicates with Enriquez inside the picket; Enriquez subsequently exits the picket; and the physical confrontation follows.

Defendants instead begin their factual narrative by stating that Plaintiff "aggressively approached Enriquez."

The omitted beginning of the J1 B Wing footage matters precisely because it bears upon which version a factfinder might believe. *See* Wenckens Decl. ¶¶ 8–12.

The Court should not resolve that dispute by relying upon a recording that begins only after the disputed initiating event.

### C. The Objective Start and Stop Times Undermine Defendants' Claim That Their Narrative Is Undisputed.

The temporal limitations of the recordings create additional factual questions.

According to Plaintiff's review, Exhibits E, F, and G each begin at approximately 3:45:20 a.m. and terminate at approximately 3:58:21 a.m. Exhibit D, the separate handheld recording, lasts approximately five minutes and forty-eight seconds and ends, according to the statement audible on the recording, at approximately 4:04 a.m. *See* Wenckens Decl. ¶¶ 13–17.

Defendants' written accounts nevertheless describe numerous events occurring during this compressed period, including alleged de-escalation efforts, verbal orders, the physical confrontation, activation of the Incident Command System, arrival of officers from other locations, attempts to restrain Plaintiff, Plaintiff's alleged resistance, orders concerning Plaintiff's restraint, an instruction for Rodriguez to retrieve a handheld camera, Rodriguez traveling to retrieve that camera, his return, and commencement of the handheld recording.

Plaintiff identifies specific conflicts between this timeline and the officers' statements, including Ortega's statement that he was in the chow hall when ICS was initiated and the evidence concerning the distance Rodriguez traveled to obtain the camera. *See* MSJ Ex. C at DEF_0720-21, DEF_0724.

A reasonable jury could consider these objective timing circumstances in evaluating the accuracy and credibility of Defendants' written accounts.

Summary judgment cannot properly be based upon accepting Defendants' preferred interpretation of those disputed facts.

### D. Whether Plaintiff Threw "Hot Coffee" Into Enriquez's Face Is Genuinely Disputed.

The allegation that Plaintiff threw hot coffee into Enriquez's face is central to Defendants' Motion. Defendants repeatedly rely upon it to establish a need for force, proportionality, a reasonably perceived threat, good faith, and qualified immunity.

But the evidence does not conclusively establish that the cup contained hot coffee.

Plaintiff's review of the surveillance footage indicates that Plaintiff can be observed swinging the cup while walking. He specifically identifies the cup as visible at approximately 3:56:01 on the J1 B Wing recording and approximately 3:57:29 on the J1 Picket recording.

The manner in which Plaintiff carries and swings the cup permits a reasonable factfinder to question Defendants' characterization that Plaintiff was carrying a cup 'full' of hot coffee. *See* Wenckens Decl. ¶¶ 18–21.

Other evidence reinforces the factual dispute. Plaintiff observes that photographs taken following the incident do not appear to show coffee or liquid on Enriquez's clothing. Plaintiff further observes that the aftermath recording does not appear to depict spilled coffee on the pavement in the area of the confrontation. *See* Wenckens Decl. ¶¶ 22–23.

The documentary descriptions themselves also vary. As Plaintiff's notes identify, different records describe the event as throwing a "cup," a "cup of coffee," "hot coffee," and a "cup full of coffee." *See, e.g.*, MSJ Exs. B-C at DEF_0687, DEF_0713, DEF_0715, DEF_0724-25, DEF_0737.

Plaintiff is not required at summary judgment to conclusively establish that the cup was empty. The relevant point is that reasonable jurors could draw competing inferences from this evidence.

Whether Plaintiff threw hot coffee into Enriquez's face therefore cannot properly be treated as an undisputed fact.

### E. Defendants' Own Use-of-Force Evidence Contains Material Evidence Favorable to Plaintiff.

Defendants characterize their institutional records as corroboration of their account. But those records contain evidence undermining the proposition that this was an uncomplicated, policy-compliant use of force.

TDCJ's own review identified missing documentation and specifically noted that Plaintiff's allegations concerning being assaulted by multiple staff members while supervisors witnessed the incident had not been addressed.

The review process sought additional documentation, photographs of Plaintiff's injuries, photographs of staff injuries, and surveillance footage of the actual area where the incident occurred.

These deficiencies matter because Defendants now rely heavily upon that same investigative packet to establish the supposed absence of a factual dispute.

More significantly, TDCJ's internal review found deficiencies concerning Enriquez's conduct. The records reflect a formal internal determination that the employee acted inappropriately during the incident. Specifically, the Texas Department of Criminal Justice's own Employee Behavioral Intervention Fact-Finding Inquiry concluded: "Correctional officer IV manuel Eriquez Failed to utilize Deescalation techniques and Officer Enriquez Failed to Maintain a Safe Physical Distance." *See* MSJ Ex. C at DEF_0700. Following that finding, the agency issued an informal disciplinary action against the employee. *See* Captain Alvarez's Letter of Instruction, at MSJ Ex. C, DEF_0701. A reasonable jury may consider Defendants' own agency's findings

when determining whether Enriquez's conduct represented a good-faith effort to restore discipline or whether the confrontation developed differently from the account Defendants now present.

**F. Defendants' Own Report Acknowledges That Perez and Ortega Used Force.**

The documentary evidence also contains a significant inconsistency concerning Perez and Ortega.

Defendants' Use-of-Force materials state that Perez and Ortega grabbed Plaintiff's arms, pushed Plaintiff against the wall, pulled him downward into a prone position, and continued attempting to secure his arms behind his back.

The same narrative expressly states that Flores "did state on camera that Officer Ortega and Officer Perez did not use force but in fact they did." (MSJ Ex. C. at DEF_0713.)

That record directly demonstrates why the Court cannot simply accept the officers' descriptions of the incident as undisputed.

It also bears upon Plaintiff's surviving bystander claims because it demonstrates that Perez and Ortega were physically present during a material portion of the encounter and raises factual questions concerning precisely what they witnessed and when.

**G. Genuine Issues of Material Fact Exist as to Flores's Personal Use of Force.**

Plaintiff's excessive-force claim against Flores does not rest solely upon Flores's supervisory presence or failure to intervene. Plaintiff states under penalty of perjury that, after losing consciousness during the incident, he regained consciousness and recalls Flores slapping him. *See* Wenckens Decl. ¶¶ 27–28. Viewed in Plaintiff's favor, this testimony constitutes evidence of Flores's personal participation in the use of force. Whether that force occurred, whether Plaintiff was then restrained or otherwise subdued, and whether any legitimate

penological need existed for additional force are disputed factual questions that cannot be resolved on summary judgment.

Plaintiff's account that force continued after he was restrained is further corroborated by an eyewitness statement previously filed under seal. The eyewitness reported observing Enriquez repeatedly strike Plaintiff, stated that Plaintiff did not throw a punch, and further reported observing Enriquez knee and slap Plaintiff after Plaintiff had already been placed in hand restraints. *See* Doc. 44, Ex. A (filed under seal).

### H. The Extent of Plaintiff's Injuries Does Not Eliminate His Excessive-Force Claim.

Defendants acknowledge that Plaintiff was transported to an outside hospital following the incident and was diagnosed with contusions to his face, chest, and abdomen and treated for a laceration near his eyebrow.

Defendants' own Motion acknowledges that Plaintiff's injury was more than de minimis for purposes of the *Hudson* analysis. Nevertheless, Defendants ask the Court to find Plaintiff's description of additional injuries "implausible." That is not a proper basis for resolving the excessive-force claim on summary judgment.

The constitutional inquiry does not turn exclusively upon the ultimate extent of injury. The question is whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the purpose of causing harm. *Hudson v. McMillian*, 503 U.S. 1, 7 (1992).

Moreover, disagreements concerning the precise extent of Plaintiff's injuries do not resolve the central factual disputes concerning how the confrontation began, what force was used, how long it continued, and whether force continued after Plaintiff ceased presenting a threat.

## I. Genuine Fact Issues Exist Under the Hudson Factors.

The Hudson factors do not support summary judgment when the evidence is viewed in Plaintiff's favor. Under *Hudson*, a court must weigh: (1) the extent of the injury suffered, (2) the need for the application of force, (3) the relationship between that need and the amount of force used, (4) the threat reasonably perceived by the responsible officials, and (5) any efforts made to temper the severity of a forceful response. 503 U.S. at 7.

1. **Extent of injury.** Plaintiff's injuries required evaluation and treatment at an outside hospital. His principal diagnosis included multiple contusions with soft-tissue hematoma to the scalp, forehead, chest, and abdomen, as well as an abnormal serum liver function test. Plaintiff was also given head-injury precautions upon discharge. These contemporaneously documented injuries, together with the laceration near Plaintiff's eyebrow requiring treatment, support Plaintiff's contention that he sustained more than a trivial injury during the use of force. *See* MSJ Ex. A at DEF_0608; Wenckens Decl. ¶ 30.

2. **Need for force.** The parties sharply dispute who initiated the physical confrontation and what threat Plaintiff posed. Defendants' justification for the use of force depends substantially upon their allegation that Plaintiff threw hot coffee at Enriquez and assaulted him. That allegation is materially disputed. As discussed above, Defendants' own records inconsistently describe the object and its contents as a "cup," a "cup of coffee," "hot coffee," and a "cup full of coffee," while the surveillance footage depicts Plaintiff carrying and swinging the cup shortly before the confrontation. *See supra* § IV.D; Wenckens Decl. ¶¶ 18–23. These factual disputes bear directly upon whether, and to what extent, force was necessary.

3. **Relationship between the need and amount of force.** Plaintiff alleges force substantially greater than necessary to restore order and maintains that force continued after

he was on the ground and no longer presented the threat claimed by Defendants. *See* Wenckens Decl. ¶¶ 27–29.

**4. Threat reasonably perceived.** This factor depends upon the same disputed facts concerning how the encounter began, whether Plaintiff possessed or threw hot coffee, who initiated the physical confrontation, and Plaintiff's actions after officers arrived. *See* Wenckens Decl. ¶¶ 4–12, 24–29.

**5. Efforts to temper the response.** Defendants contend that de-escalation was attempted. Plaintiff disputes that characterization, and Defendants' own institutional review identified a failure concerning de-escalation and maintaining physical distance. *See* MSJ Ex. C at DEF_0700.

These are factual questions, not matters that may properly be resolved by weighing Defendants' account against Plaintiff's at summary judgment.

## V. Genuine Fact Issues Preclude Summary Judgment On Bystander Liability

Defendants' bystander-liability argument depends substantially upon their contention that no underlying constitutional violation occurred. Because genuine disputes exist concerning the underlying use of force, that argument cannot support summary judgment.

Under governing Fifth Circuit precedent, an officer may be held liable under § 1983 under a theory of bystander liability where the officer: (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act. *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013); *Joseph v. Bartlett*, 981 F.3d 319, 343 (5th Cir. 2020).

There are also independent disputes concerning which officers were present, when they arrived, what they witnessed, and whether they had sufficient opportunity to intervene. The Fifth

Circuit has made clear that liability hangs on whether an officer was well-positioned to intervene but failed to do so. *Joseph*, 981 F.3d at 343.

Plaintiff's Original Complaint alleges that officers were present during the assault and failed to intervene. *See* Wenckens Decl. ¶ 29. The evidence concerning the officer previously identified as John Doe No. 1 is particularly important. Plaintiff's review of Defendants' evidence identifies that officer as David Rodriguez. According to Rodriguez's own written statement, he witnessed the verbal altercation, observed the subsequent confrontation, initiated ICS, remained present while additional officers arrived, and was later instructed by Flores to retrieve the video camera. *See* MSJ Ex. C at DEF_0724.

Those facts permit a reasonable inference that Rodriguez was present for a meaningful period during which he could observe what was occurring. Whether Rodriguez—or Perez or Ortega—actually had a reasonable opportunity to intervene necessarily depends upon disputed facts concerning how long the force lasted, what each officer witnessed, and when each officer became present. Where material facts regarding the elements of bystander liability are in serious dispute, summary judgment must be denied. *See Kitchen v. Dallas Cnty.*, 759 F.3d 468, 481 (5th Cir. 2014).

Those questions belong to the factfinder.

## VI. Qualified Immunity Does Not Support Summary Judgment

Defendants frame the qualified-immunity issue as whether Plaintiff possessed a clearly established constitutional right to refuse orders, throw hot coffee at an officer, punch an officer, and resist restraints. That framing assumes Defendants' version of disputed facts.

Plaintiff does not claim a constitutional right to assault a correctional officer. He claims that officers subjected him to force maliciously and sadistically beyond what was necessary to

restore discipline and that officers who witnessed unconstitutional force and had a reasonable opportunity to intervene failed to do so.

The Court therefore cannot decide qualified immunity by first assuming that Plaintiff threw hot coffee, initiated the assault, continuously resisted restraint, and remained a threat throughout the force. Those propositions are disputed. *See* Wenckens Decl. ¶¶ 24–29.

Viewing the evidence and reasonable inferences in Plaintiff's favor, genuine factual disputes remain concerning the reason force was initiated, the amount and duration of force, whether Plaintiff continued to pose a threat, and whether other officers had an opportunity to intervene.

Qualified immunity therefore does not warrant summary judgment.

**Conclusion**

Defendants have not established an absence of genuine disputes of material fact.

The video evidence does not provide a continuous recording of the events giving rise to Plaintiff's claims. Most significantly, the portion of the J1 B Wing recording submitted by Defendants begins after the initial verbal encounter that Plaintiff maintains occurred within that camera's coverage and precipitated the subsequent confrontation.

The footage that was submitted permits reasonable inferences supporting Plaintiff's account, including evidence concerning the sequence by which another officer communicated with Enriquez before Enriquez left the picket. The objective start and stop times also raise questions concerning whether Defendants' lengthy narrative can be reconciled with the available timeline.

The evidence further permits competing reasonable inferences concerning whether Plaintiff's cup contained hot coffee; Defendants' own institutional records identify deficiencies in the use-of-force process and staff conduct; and their own narrative contains inconsistencies concerning the force used by Perez and Ortega.

These disputes concern the core questions underlying the Hudson analysis, bystander liability, and qualified immunity.

The Court may not resolve those disputes, determine credibility, or draw competing reasonable inferences against Plaintiff at summary judgment.

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that the Court DENY Defendants Enriquez, Perez, Ortega, and Flores's Motion for Summary Judgment and permit Plaintiff's surviving excessive-force and bystander-liability claims to proceed to trial, together with all other relief to which Plaintiff may be entitled.

Dated: September 17, 2026.

Respectfully submitted,

JUSTIN DEWAYNE WENCKENS
TDCJ ID NO. 02477197
H. H. Coffield Unit
2661 FM 2054
Tennessee Colony, Texas 75884

***Plaintiff Pro Se***

## Certificate of Service

In accordance with the Federal Rules of Civil Procedure, I hereby certify that a true and correct copy of the foregoing document has been served via USPS Priority Mail on the following counsel on September 17, 2026:

***Counsel for Defendants:***

**Ken Paxton**
Attorney General of Texas
**Brent Webster**
First Assistant Attorney General
**Ralph Molina**
Deputy First Assistant Attorney General
**Austin Kinghorn**
Deputy Attorney General for Civil Litigation
**Briana M. Webb**
Acting Division Chief
Law Enforcement Defense Division

**JORDAN GRUNDHOEFER**
Assistant Attorney General
Law Enforcement Defense Division
jordan.grundhoefer@oag.texas.gov
Law Enforcement Defense Division
Office of the Attorney General
P. O. Box 12548, Capitol Station
Austin, Texas 78711

JUSTIN DEWAYNE WENCKENS
TDCJ ID NO. 02477197

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**PECOS DIVISION**

| | | |
|---|---|---|
| **JUSTIN DEWAYNE WENCKENS,** | § | |
| **TDCJ NO. 02477197,** | § | |
| ***Plaintiff*,** | § | |
| | § | |
| **v.** | § | **P-25-CV-00005-DC** |
| | § | |
| **MANUEL ENRIQUEZ, JR., *et al.*,** | § | |
| ***Defendants*.** | § | |

**Declaration of Justin Dewayne Wenckens**

I, Justin Dewayne Wenckens, declare as follows:

1. My name is Justin Dewayne Wenckens. I am the Plaintiff in this action. I am over eighteen years of age, competent to make this declaration, and the facts stated herein are based upon my personal knowledge.

2. I was personally involved in the incident that occurred on July 20, 2024, which is the subject of this lawsuit.

3. I have personally reviewed the video recordings produced by Defendants and submitted in support of their Motion for Summary Judgment, including the recordings identified as

   Ex. D – Video of UOF Aftermath (M-06086-07-24) [DEF_0740].MTS;

   Ex. E – Video of J1 B Wing (ch06_20240720034520) [DEF_0741].mp4;

   Ex. F – Video of J1 Picket (ch09_20240720034520.mp4) [DEF_0742].mp4; and

   Ex. G – Video of J1 D Space (ch11_20240720034520) [DEF_0743].mp4.

**The Initial Verbal Exchange and Video of J1 B Wing (Ex. E):**

4. Before the physical confrontation outside, the initial verbal exchange regarding the cell lights occurred entirely while Officer Enriquez was safely locked inside the secure control picket. I was standing on the dayroom floor outside the picket window. Based upon my personal knowledge of the J1 picket and its physical layout, a person inside the picket cannot hear an audible comment made from the dayroom floor through the closed security glass.

5. This occurred while J1 B Wing was being released for chow and in the area covered by the J1 B Wing surveillance camera.

6. Officer Enriquez subsequently left his secure post inside the control picket to go outside onto the walkway where the use of force occurred. The recordings submitted by Defendants begin after the initial verbal exchange behind the glass had already occurred, omitting the true beginning of the encounter.

7. Another correctional officer was in a position to hear the comment I made.

8. The portion of the J1 B Wing surveillance video submitted by Defendants does **not** show this initial verbal exchange.

9. According to the time displayed on the surveillance footage I reviewed, the J1 B Wing video submitted by Defendants begins at approximately 3:45:20 a.m., *after* the initial verbal exchange had already occurred.

10. Near the beginning of the video submitted by Defendants, I observed the correctional officer who had heard my comment go to the picket and communicate with Enriquez.

11. Shortly thereafter, Enriquez left the picket.

12. The portion of the J1 B Wing recording submitted by Defendants therefore does not contain the beginning of the encounter that preceded Enriquez leaving the picket and the subsequent physical confrontation.

**Start and Stop Times of the Surveillance Recordings**

13. I personally reviewed the Ex. E (J1 B Wing), Ex. F (J1 Picket), and Ex. G (J1 D Space) surveillance recordings submitted by Defendants.

14. Based upon the timestamps displayed on the recordings, those surveillance videos begin at approximately 3:45:20 a.m. and end at approximately 3:58:21 a.m.

15. I also reviewed the separate handheld use-of-force/aftermath recording Ex. D.

16. The aftermath recording lasts approximately five minutes and forty-eight seconds. Near the conclusion of that recording, the time is stated to be approximately 4:04 a.m.

17. The surveillance videos and the handheld aftermath video submitted by Defendants do not provide one continuous recording depicting all events from the initial verbal exchange through the conclusion of the incident.

**The Cup**

18. I also reviewed the surveillance recordings for the portions depicting the cup I was carrying.

19. On the J1 B Wing recording, at approximately **3:56:01 a.m.**, I can be seen carrying the cup.

20. On the J1 Picket recording, at approximately **3:57:29 a.m.**, I can be seen carrying and swinging the cup as I walk.

21. The manner in which I am swinging the cup is visible on the recording and can be evaluated directly from the video.

22. I have also reviewed the photographs of Enriquez contained in Defendants' summary-judgment evidence. I do not observe coffee or other liquid on Enriquez's clothing in those photographs.

23. I reviewed the aftermath recording as well. I do not observe spilled coffee or an area that appears wet from spilled coffee on the pavement where the incident occurred. I do observe what appears to be blood.

**Events During the Use of Force**

24. I did not initiate a physical assault upon Enriquez in the manner described in Defendants' Motion for Summary Judgment.

25. The physical encounter did not begin simply because I suddenly and aggressively approached Enriquez as Defendants describe.

26. The confrontation occurred after the earlier verbal incident described above, after another officer communicated with Enriquez at the picket, and after Enriquez left the picket.

27. During the physical encounter, I was subjected to force by correctional officers. I was taken to the ground and at some point lost consciousness.

28. When I regained consciousness, I recall Officer Flores slapping me and Enriquez stating words to the effect that he had "kicked [my] fucking ass."

29. I maintain that officers were present during portions of the force used against me and failed to intervene to stop it.

30. I was subsequently transported to an outside hospital for evaluation and treatment of injuries I sustained during the incident.

**Defendants' Video Evidence**

31. My description of the incident is not based solely upon my interpretation of Defendants' videos. I personally experienced the events described in this declaration.

32. My statements concerning what is depicted on the recordings are based upon my personal review of the recordings Defendants produced.

33. The portion of the J1 B Wing video submitted by Defendants begins after the initial verbal incident described above and therefore does not depict that portion of the events.

34. The videos submitted by Defendants do not depict every event that occurred during the incident that is the subject of this lawsuit.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 14, 2026.

JUSTIN DEWAYNE WENCKENS
TDCJ ID NO. 0247719